Peelle, J.,
delivered the opinion of the court:
The claimant, a lieutenant in the United States Navy, seeks to recover under section 13, act of March 3, 1899 (30 Stat. L., 1007)—
(1) The sea pay of his grade from. July 10 to August 11, 1900, while traveling under the order of the Secretary of the Navjr on a mail steamer from San Francisco to the Asiatic Station, at Manila, P. I., where, bjr order of the commander in chief at that station, he was on August 12, 1900, assigned to duty on the U. S. S. Monocacy, -on which v'essel he served until after October 31, 1901.
(2) He also seeks to recover under said act and the army appropriation act of March 2, 1901 (30 Stat. L., 903), the 10 per cent increase on his pay proper for service in China from July 10, 1900 — the date of his departure from San Francisco on the mail steamer for the Asiatic Station — to March 1,1901.
(3) ITe further seeks to recover under said act of March 2, 1901, the increase of 10 per cent on his pa}1' proper for services outside the United States and Territories contiguous thereto, from the date of said act to October 31, 1901.
(4) He further seeks to recover commutation for the sea ration under Revised Statutes, sections 1578 and 1585, from September 29, 1899, to October 31,1901.
(1) Concerning the first claim, for sea pay, Revised Statutes, section 1571 provides that “no service shall be regarded as sea service except such as shall be performed at sea under the orders of a department and in a vessel employed by authority of law. ”
Section 13; act of March 3, 1899, provides that—
‘ ‘ after June thirtieth, eighteen hundred and ninety-nine, commissioned officers of the line of the Navy and of the Medical and Pay Corps, shall receive the same pay and allowances, except forage, as are or may be provided by and in pursuance of law for the officers of corresponding rank in the Army: Provided, That such officer when on shore shall receive the allowances, but fifteen per centum less pay than when on sea duty.” * * *
As the findings disclose, the claimant was performing service on the U. S. T. S. Monongahela at the time ho was detached therefrom and ordered to proceed to the Asiatic Station.
*147 Tbe question is: What was his status in respect to pay while en route to the Asiatic Station on board the mail steamer?
It is our duty to give effect to the statute, if that can be. done, and to do that we must of necessit}*- determine which rate of pay provided for by section 13 the claimant is entitled to.
By the purview or enacting- clause of section 13, the officers: of the line of the Navy and of the Medical and Pay Corps are given but one rate of pay, i. e., the higher dr normal pajr, but when serving- on shore the first proviso thereto carves special exceptions out of the enacting clause and gives them “the allowances, but 15 per cent less pay.”
The exceptional pay, therefore, is shore pay, while the higher is sea pay, both dependent upon the character of the service to which they may be assigned by the Navy Department, whose orders in that inspect are controlling if not in conflict with the law.
The act of 1899 does not repeal or in any way modify Ee-vised Statutes, section 1571, defining what shall constitute sea service; and as that section has been the subject of judicial construction in numerous cases, both by the Supreme Court and this court, it only remains for us to ascertain the purport of those decisions.
In the Symonds case (21 C. Cls. R., 148), affirmed by the Supreme Court (120 U. S., 46, 50), the latter court says:
“We concur in the conclusion reached by the Court of Claims, namely, that tbe sea pay given in section 1556 may be earned bjr service performed under the orders of the Navy Department in a vessel emploj-ed, with authority of law, in active service in baj^s, inlets, roadsteads, or other arms of the sea, under the general restrictions, regulations, and requirements that are incident or peculiar to service on the high seas.”
The case of Bishop v. The United States (21 C. Cls. R., 215) was affirmed‘by the Supreme Court (120 U. S., 51) for the reasons set forth in the Symonds case.
In the Barnette case (30 *C. Cls. R., 197), affirmed by the Supreme Court (165 U. S., 174), the latter court said:
“In order to come within the phrase‘at sea,’as used in this statute, it is not necessary that the vessel upon which the *148 service is performed should be upon the high seas. It is enough that she is water borne, even if at anchor in a bay, port, or harbor, and not in a condition presently to go to sea. It has correctty been adjudged by this court that a vessel is ‘at sea,’within the meaning of the statute, although she is used as a training ship, anchored in a bay, and not in a condition to be taken out to sea beyond the mainland, or is used as a receiving ship at anchor in port at a navy-yard and connected with the shore by a rope and having a roof built over her deck, and not, technically, in a condition for sea service.’,
In that case the officer claiming sea pay lived on board the vessel, wore his uniform, and was subject to the regulations respecting sea service; and so in the case of Wyckoff (34 C. Cls. R., 288), where the officer in command of the II. S. S. Eipsic, at anchor in the bay at Puget Sound (with a force on the vessel in the emplojnment of the Bureau of Yards and Docks), the regulations applicable to a vessel at sea were observed, and the officer’s quarters remained continuous^ on board, and for that reason he was allowed to recover sea pay.
In the Hannum case (36 C. Cls. R., 99), whore an officer was directed to proceed to League Island Navy-Yard, Pa., for duty in charge of the machinery of the U. S. S. Columbia and the Minneapolis, and thereafter to take charge of the U. S. S. Yankee in addition to his former duty, yet as the claimant lived on board the U. S. S. Columbia during that time and conformed to all the regulations governing vessels in commission, in the same manner as other officers attached to seagoing vessels, he was for that réason allowed to recover the sea pay of his grade.
In the McGowan case (36 C. Cls. R., 63), though the vessel had its crew and there were attached thereto medical and parr officers, chaplain and engineer and warrant officers, the officer in command of the vessel, who was also commander of the training station, took his meals at quarters assigned to him on shore, and the marines under his command were also quartered in barracks on shore, but as the time spent in actual duty on shipboard was not segregated from that performed on shore, he was not allowed to recover sea pay, the court saying:
‘ 1 When a duty partakes of the character of sea service and shore duty, the facts of each particular -case must be consid *149 ered, and if from tbe whole case there is a preponderance in favor of either service, the service having the paramount character must constitute the basis on which to predicate the right of payment.”
In the recent case of Taussig (ante, p. 104) the-officer was assigned to the command of a vessel in the Coast and Geodetic Survey, but it was not shown that the claimant lived aboard the vessel or took his meals there. On the contrary, it was shown that' his duties as hydrographic inspector were of far more importance than his duties as commanding officer of-the vessel, and for that reason he was held not entitled to recover sea pay.
But we need not refer to other cases in support of the principles announced in the Symonds and Strong cases. The clear meaning deducible from them all is that to entitle an officer to the higher rate or sea pay provided by section 13, act of 1899, it must appear that such officer performed service “at sea under the orders of a Department and in a vessel employed by authority of law.'” Such we conceive to be the meaning of those cases — not that such service must have been performed on the “high seas beyond the sight of land,” but such services must have been “performed under the orders of the hlavy Department in a vessel employed bjr authority of law, in active service in bays, inlets, roadsteads, or other arms of the sea, under the general restrictions, regulations, and requirements that are incident or peculiar to service on the high seas,” as held by the Supreme Court in the Sjunonds case (supra).*
The character of the claimant’s service, however, on board the U. S. T. S. Monongahela, from which he was detached and ordered to report to the Asiatic Station, is not in question in this case. The question is: Was the claimant’s travel in a merchant vessel sea service within the meaning of section 1571 as construed by the Supreme Court and this court in the' cases to which we have referred?
To so hold would not only be in conflict with the order of the Secretary of the Navy detaching the claimant from the vessel on which alone sea service can be performed, but would clearly not be in harmony with the decisions to which we *150 have referred, and would, in our opinion, be also in conflict with the express language of section 1571.
The status of an officer on sea or shore duty must be determined b}r the order of assignment by the Navy Department, whose order, in so far as it does not change the character of the service defined in section 1571, is controlling; that is to sa3T, it is for the Navjr Department to determine when and where an officer shall be assigned to duty and when he shall be detached therefrom; and while the service performed under such order will determine the basis of his pay, the order otherwise is conclusive on the court.
And so we must hold that when the claimant was “detached from duty on board the U. S. T. S. Monongahela” he thereby ceased to perform sea service, and consequently ceased to be entitled to sea pay and became entitled to the exceptional pay known as shore pay, provided for by the proviso to section 13, act of 1899, which shore pay continued until he was again ordered to duty on a vessel at sea ‘ ‘ employed by authority of law.”
It follows that when an officer is detached from duty on board a vessel in which he performed sea service, that his sea-pay ceases and his shore pay begins, though he majr thereafter travel by sea on a merchant vessel from one post of duty at sea to another.
The rule may seem harsh, but it is the law embodied in that section; that is to say, travel in a merchant vessel at sea is not sea service within the meaning of section 1571, as construed by the Supreme Court as well as this court, and our duty is to give effect to the statute in harmony with thosq decisions.
2. The claimant also seeks to recover the 10 per cent increase on his pajr proper for service in China, under the second proviso to the Army appropriation act, March 2,1901 (31 Stat. L., 903), which act he claims was made applicable to the officers of the Navy by the second proviso to said section 13, act of March 3, 1899.
He claims the 10 per cent from July 10, 1900, while traveling under orders frpm San Francisco on the mail steamer to the Asiatic Station and while serving, to March 1, 1901, on the U. S. S. Monocacy, “stationed continuousty on thePeiho *151 River at or near Tonglcu, China,” as set forth in finding xv, which is in brief that the vessel was for a portion of the time secure^ moored alongside the wharf of the China Engineering'and Mining Company about 4 miles above the mouth of said liver, having gangways out and being connected with the shore by telephone wires.
In that position the vessel served as a station for the United States Signal Sei’vice, post-office station under the Post-Office Department for the use of the United States forces and other people of the United States in China. It furnished a guard up and down the river from Tientsin to Tonglm on one or two occasions and regularly had charge of. the United States mail between those two places, with sentries constantly posted on duty on shore. Houses on shore were used as places for storage and residences for the men. The vessel furnished all the distilled water for the army ashore, both for the United States and British troops, and was a resting and stopping-place for the various army officers and troops coming and going. Also a part of the time the, Monocacy was in a mud dock about 2 miles below the wharf and 2 miles above the mouth of the river. The mud dock was the usual ti^pe of docks excavated for the safe-keeping of vessels in North China during the winter season, to protect "them from floating ice.
While in said dock the vessel was securely fastened to the shore b}r chains, and was connected by telephone wire as above, and completely housed over with matting framework. The latrines and men’s clubs were ashore.
On leaving said dock in April following, the vessel went out into midstream, an eighth of a mile from the shore, without telephone connection, but continued to furnish distilled water for the troops.
The second proviso to section 13 reads:
“That when naval officers aré detailed for shore duty beyond seas, they shall receive the same pay and allowances as are or may be provided by or in pursuance of law for officers of the Army detailed for duty in similar places.”
By the Army appropriation act of March 2, 1901 (31 Stat. L., 903), it is provided:
“For additional ten per centum increase on paj^ of officers serving at foreign stations, five hundred thousand dollars: *152 Provided, That hereafter' the pay proper of all officers and enlisted men serving beyond the limits of the States comprising the Union, and the Territories of the United States contiguous thereto, shall be increased ten per centum for officers and twenty per centum for enlisted men over and above the rates of pay proper as fixed by law for time of peace, and the time of such service shall be counted from the date of depar--■ture from said States to the_date of return thereto: Provided further, That the officers and enlisted men who have served in China at any time since the twenty-sixth day of May, nineteen hundred, shall be allowed and paid for such service the same increase of pay proper as is herein provided for.”
The question presented, therefore, is as to whether officers of the Navy who served in Chinese waters are entitled under .the last proviso to said act, March 2, 1901, to the increase of 10 per cent therein provided for.
The vessel on which the claimant served was in commission for sea service, and, as shown in the findings, the claimant was paid during such period at the rate of $2,520 per annum, being the highest rate of pay of an officer of corresponding-rank (captain) in the Army for twenty years of service. (Rev. Stat., secs. 1261, 1262, and 1263.)
As wTe have seen, the claimant was assigned to duty on the Monocacy by the commander in chief of the Asiatic Station pursuant to the order of the Secretary of the Navy; and therefore in respect of this question, as of the first, it must be held that his status as an officer in sea service continued until by competent authority he was detached therefrom.
Had the claimant been “ detailed for shore duty” in China, as authorized bjr the second proviso of section 13, act of 1899, then such service, being “ beyond seas,” would entitle him to the increase of 10 per cent provided for by the second proviso to the act, March 2, 1901. But the claimant was not detailed for shore duty “beyond seas,” nor did he serve on shore in China, and therefore he is'not entitled to the increase therein provided for ‘ ‘ officers of the Army detailed for duty in similar places.”
3. In respect to the claim for the increase of 10 per cent for service outside the United States and Territories contiguous thereto, after March 2 to October 81, 1901, under the first proviso to said act, March 2, 1901, it will be observed that in *153 this, as in the next preceding claim, the act applies to the officers and enlisted men of the Army. The claimant is not, therefore, entitled to recover thereunder unless the act is clearly brought within the second proviso to said section 13, act of 1899, providing- that “when naval officers are detailed for shore duty beyond seas, they shall receive the same pay and allowances as are or may be provided by or in pursuance of law for officers of the Army detailed for duty in similar places.”
It will thus be seen that the condition of recovering the assimilated increase is “when naval officers are detailed for shore duty beyond seas.” The words “detailed for shore duty beyond seas ” can not be construed to mean a detail fox-duty on seas. Beyond seas means shore duty. This construction appears to be in harmony with the naval appropriation act, March 3, 1901 (30 Stat. L., 1108), passed the next day after the Army appropriation act providing for an increase of 10 per cent, wherein it is provided-—
“that officers of the Navy, and officers and enlisted men of the Marine Corps, who have been detailed, or may hereafter be detailed, for shore duty in Alaska, the Philippine Islands, Guam, or elsewhere beyond the continental limits of the United States, shall be considered as having been detailed for ‘ shore duty beyond seas,’ and shall receive pay accordingly.” * * *
It will thus be observed by the provisions of that act that, when such officers or enlisted men are detailed for shore duty in our island possessions or elsewhere beyond the continental limits of the United States, they “shall be considered as having been detailed for shore duty beyond seas.” That is to say, before the officers of the Navy can recover the increase provided for by the act of March 2,1901, they must show that they have been detailed for shore duty within the meaning of the second proviso to said section 13. -
In the caption or heading to the pi-ovisos in the army appropriation act, March 2, 1901, making an appropriation of $500,000 for the additional 10 per cent, are the words, “officers serving at foreign stations,” and much stress is laid by counsel on the words, “foi-eign stations;” but conceding its importance, the words ai-e omitted from the provisos which follow. *154 It may, however, be said that service “beyond the limits of the United States, comprising the Union and the Territories of the United States contiguous thereto,” as expressed in the first proviso, is the equivalent in law of service at a “foreign station. ” But as that appropriation was made for the Army— the land forces of the United States — the words “foreign stations,” as therein used, as well as the words quoted from the first proviso, must be construed to mean a station or service on shore, and therefore, as the claimant was not detailed for shore duty and did not perform shore duty within the meaning of the second proviso to section 13 of the navy personnel act, he is not entitled to recover the 10 per cent provided for in the first proviso to act of March 2, 1901.
4. The claim for commutation of sea ration is disposed of adversely to the claimant in the case of Charles M. Thomas v. United, States (ante, p. 113) and need not be further considered here.
Petition dismissed.